UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAKE CHARLES DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | DOCKET NO. 2:20-cr-00079 |
| VERSUS | : | JUDGE JAMES D. CAIN, JR. |
| TREVOR SELWYN DANIEL | : | MAGISTRATE JUDGE KAY |

**REPORT AND RECOMMENDATION**

Before the court is a Motion to Suppress filed by defendant Trevor Selwyn Daniel on July 10, 2020. Doc. 31. The government opposes the motion. Doc. 45. An evidentiary hearing was held on November 23, 2020. Doc. 64. Both sides have submitted post-hearing briefs. Docs. 70 & 71. Based on our review of the law, the memoranda filed by the parties and testimony adduced at the hearing, we **RECOMMEND** that the motion be **DENIED**.

**I.**
**BACKGROUND**

The defendant was indicted for possession with intent to distribute cocaine. Doc. 1. The indictment alleges that on or about February 12, 2020, defendant knowingly and intentionally possessed with intent to distribute five kilograms or more of a mixture and substance containing a detectable amount of cocaine, a Schedule II controlled substance. *Id*. Defendant claims that the contraband was obtained during an unconstitutional search of his rented vehicle. Doc. 31, p. 1. The search was conducted without a warrant but was predicated upon a K-9 alert to an odor of narcotics in defendant's vehicle. Doc. 31, att. 2, p. 6.

Louisiana State Trooper McKee, who conducted the traffic stop, testified at the evidentiary hearing. Doc. 67, pp. 4-63. The government introduced at the hearing Trooper McKee's body camera footage from the traffic stop, and this exhibit was also attached to defendant's Motion. *Id*., pp. 7-8; see also Doc. 31, att. 3. While conducting interdiction patrol along Interstate 10, McKee noticed defendant's vehicle brake abruptly while passing him, despite travelling at a reasonable speed. Doc. 67, p. 6. McKee began to follow the vehicle, and observed it drift from the middle lane over the dashed line on the interstate. *Id*., p. 7. McKee then conducted a traffic stop for improper lane usage. *Id*., p. 7. McKee asked defendant for his ID and, while retrieving his wallet from the vehicle, defendant advised that it was a rental car. Doc. 31, att. 4, p. 1. McKee and the defendant walked to the other side of the car to retrieve the rental agreement from the glove compartment and the officer observed "four or five dark colored bags" in the rear cargo area of the vehicle. *Id*. McKee also noticed that the car was "littered with trash, open and unopened snack food, fast food and multiple different types of beverages." *Id*. McKee testified that this indicated to him that defendant had been traveling over a long distance without stopping. Doc. 67, p. 10. McKee also noted that later, upon learning that defendant only made a two-day trip to Texas, he thought it was a "lot of luggage for one person just for a short trip." *Id*., p. 10.

Upon McKee commenting on defendant's messy car, he testified that defendant became nervous, handing McKee his whole wallet rather than just his ID, and handing him some random piece of paper instead of the rental agreement. *Id*., p. 12. Defendant also explained, without solicitation, that he had been travelling for his security business. *Id*. When asked about his travel itinerary, McKee testified that defendant responded very vaguely and stuttered. *Id*., pp. 12-13. Defendant responded he was travelling from "down there" and upon McKee's further questioning, he clarified that he had been in Texas—specifically, Sugarland. *Id*. p. 12. McKee testified that

through his training and experience, he knows delayed responses, stuttering, and vague answers are indicative of deceit and hiding criminal activity. *Id*., pp. 13-14. In contrast, when McKee asked him about his prior experience in the army, he answered quickly and without hesitation. *Id*., p. 14. McKee also thought it odd that the defendant was in the security business but stated that he had no weapons in the vehicle. *Id*.

McKee advised defendant he was going to his unit to run computer checks on defendant's license. Doc. 31, att. 4, p. 2. McKee checked the license plate reader ("LPR") system to verify where defendant had travelled, which indicated that the vehicle had actually travelled "south towards the Mexico border which is way south of Sugarland, Texas." Doc. 67*,* p. 18. McKee also performed a background check that revealed defendant to be a convicted felon. *Id*., p. 19. McKee found this odd, as defendant would not have been able to carry a firearm for his security business. *Id*. After completing the computer checks, McKee returned to the defendant and asked whether he had travelled anywhere besides Sugarland or if anyone else had been in possession of the vehicle for the two-day period, and defendant said no. *Id*., pp. 19-20. Defendant declined McKee's request to search his vehicle. *Id*., p. 20. McKee texted a nearby K-9 handler who arrived with his dog, and the dog alerted to the odor of narcotics after performing a "free air sniff." *Id*., p. 21; p. 70. Officers then searched defendant's vehicle, finding "25 kilos of cocaine in two large duffel bags in the cargo area." *Id*., p. 21. Defendant was arrested, read his Miranda rights, and transported to Louisiana State Police Troop D. Doc. 31, att. 4, p. 2. Upon further search of the vehicle at Troop D, McKee also located a fully loaded pistol. *Id*.

Defendant filed the instant motion to suppress the results of the search, claiming that the warrantless search and seizure were without probable cause or reasonable suspicion. Doc. 31. Defendant seeks suppression of any statements made after his arrest and any physical evidence

stemming from the detention. *Id*. While defendant concedes that the initial traffic stop for improper lane usage was justified, he contends that McKee extended the detention beyond the its original purpose without reasonable suspicion to do so. *Id*., att. 2, pp. 11-12. Defendant maintains that McKee's original justification for the stop ended once he checked defendant's license. *Id*., p. 13. As such, he maintains that McKee's additional actions, including checking the LPR system and defendant's criminal background, ordering the K-9 sniff, and searching defendant's vehicle extended the stop beyond the appropriate length of time and were therefore violative of his constitutional rights. *Id*., pp. 26-27. Defendant urges that McKee can articulate no facts demonstrating his reasonable suspicion of drug trafficking activity. *Id*. In his post-hearing brief, defendant addresses each fact that McKee relied on to form his reasonable suspicion and attempts to explain away each factor. Doc. 70, pp. 9-16.

The government opposes the motion, arguing that McKee began to develop reasonable suspicion before he discovered inconsistencies between defendant's stated itinerary and the LPR. Doc. 45, p. 8. The government contends that "numerous indicators" of criminal activity were present before McKee completed his computer check, such as: (1) defendant broke sharply when passing McKee's unit, which McKee classified as "stress-induced driving behavior" consistent with hiding criminal activity; (2) defendant's car was extremely messy, indicating that he drove a long distance in a short time without stopping and this was consistent with drug courier behavior; (3) defendant had four or five large duffel bags in his vehicle, which McKee found suspiciously excessive for just a two-day trip; (4) defendant appeared nervous and anxious, gave broken-up and vague answers to McKee's questions about his travel itinerary in contrast to the confident answers regarding his military service, and handed McKee the wrong documents; (5) defendant stated he did not have a firearm with him on that day, which McKee found suspicious in consideration of

defendant's claim that he owned a security business. Doc. 71, pp. 8-12. After McKee observed

these factors, only then did he perform the LPR computer check and confirm his suspicion that

defendant lied about where he had travelled. *Id*., p. 5. The government urges that McKee's

observations prior to performing the computer checks established reasonable suspicion that

criminal activity other than improper lane usage was afoot. *Id*., p. 11. Alternatively, it contends

McKee inarguably formed reasonable suspicion upon viewing the LPR data. *Id*., p. 12. The

government argues that since inquiries regarding a driver's travel itinerary are within the scope of

traffic violation investigation, it follows that checking the LPR database to confirm such

statements would not unreasonably extend the stop. *Id.* Even if McKee had not formed reasonable

suspicion until he ran the computer checks, the government argues this action still took less than

two minutes and would not be an unconstitutional delay.[1] *Id*., p. 14.

## II.
### LAW AND ANALYSIS

Generally, the proponent of a motion to suppress bears the burden of proving by a

preponderance of the evidence that the evidence in question was obtained in violation of his or her

Fourth Amendment rights. *United States v. Iraheta*, 764 F.3d 455, 460 (5th Cir. 2014). Where, as

here, the search is conducted without the benefit of a warrant then the burden shifts to the

government to prove by a preponderance of the evidence that its actions were constitutional.

*United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001).

---

[1] Notably, the Fifth Circuit has found that prolonging a detention without reasonable suspicion is impermissible only where the unrelated inquiries extend the stop. *United States v. Pack*, 612 F.3d 341, 349-50. (5th Cir. 2010); see also *Rodriguez v. United States*, 575 U.S. 348, 355 (2015) ("[t]he seizure remains lawful only 'so long as [unrelated] inquiries do not measurably extend the duration of the stop.'"). The reasoning behind this rule is that the Fourth Amendment seeks to protect against *detentions*, but not questioning. *Pack,* 612 F.3d at 350. Mere questioning is "neither a search nor a seizure." *United States v. Shabazz*, 993 F.2d 431, 436 (5th Cir. 1993) (citing *Florida v. Bostick*, 501 U.S. 429, 434 (1991)).

The Fourth Amendment's protection of "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" includes "vehicle stops and temporary detainment of a vehicle's occupants." U.S. CONST. amend. IV; *United States v. Andres*, 703 F.3d 828, 832 (5th Cir. 2013). The Fourth Amendment is silent as to the remedy for an unlawful search or seizure but the jurisprudentially created "exclusionary rule prohibits the introduction at trial of all evidence that is derivative of an illegal search, or evidence known as the 'fruit of the poisonous tree.'" *United States v. Singh,* 261 F.3d 530, 535 (5th Cir. 2001) (citing *United States v Grosenheider*, 200 F.3d 321, 327 (5th Cir. 2000)).

The constitutionality of a traffic stop is analyzed under the two-part framework promulgated by the Supreme Court in *Terry v. Ohio.* 392 U.S. 1, 27-31 (1968). The *Terry* test requires courts to "determine whether the stop was justified at its inception," and, if so, "whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop of the vehicle in the first place." *Andres*, 703 F.3d at 832 (quoting *United States v. Macias*, 658 F.3d 509, 517 (5th Cir. 2011)). An analysis of a traffic stop under *Terry* also mandates that "courts ... allow law enforcement officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *United States v. Brigham,* 382 F.3d 500, 507 (5th Cir. 2004) (internal quotations omitted).

The initial inquiry under *Terry* is satisfied if the officer has "an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). Additionally, "[s]o long as a traffic law infraction that would have objectively justified the stop had taken place, the fact that the police officer may have made the stop for a reason other than the

occurrence of the traffic infraction is irrelevant for purposes of the Fourth Amendment." *Goodwin v. Johnson*, 132 F.3d 162, 173 (5th Cir. 1997).

The second portion of the *Terry* framework requires that the "detention ... be temporary and last no longer than is necessary to effectuate the purposes of the stop." *Brigham*, 382 F.3d at 507. During the stop, "a police officer may permissibly examine the driver's license and registration and run a computer check on them to investigate whether the driver has any outstanding warrants and if the vehicle is stolen." *Lopez-Moreno*, 420 F.3d at 430. Such an inquiry "may be wide-ranging." *Id*. at 431. Officers may also ask about the purpose and itinerary of a driver's trip during the traffic stop. *Brigham*, 382 F.3d at 508 (citing *United States. v. Gonzalez*, 382 F.3d 755, 758-59 (5th Cir. 2003)). However, "once all relevant computer checks have come back clean, there is no more reasonable suspicion, and, as a general matter, continued questioning thereafter unconstitutionally prolongs the detention." *Lopez-Moreno*, 420 F.3d at 431. The stop may continue if the government can show an exception to the Fourth Amendment applies. *United States v. Peña-Gonzalez*, 618 F. App'x 195, 198 (5th Cir. 2015). A common exception derived from *Terry* permits extension of the stop if reasonable suspicion of additional criminal activity emerges or existed in the first place. *Id*.

Reasonable suspicion exists where an officer can "point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the search and seizure." *Lopez-Moreno*, 420 F.3d at 430. Reasonable suspicion requires an amount of proof "considerably less than proof of wrongdoing by a preponderance of the evidence" and "obviously less than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014) (quotations omitted). If additional grounds for suspicion emerge after the initial stop, the stop may extend "as long as is reasonably necessary" for the officer to resolve such suspicion. *United States*

*v. Fishel*, 467 F.3d 855, 856 (5th Cir. 2006) (quoting *Brigham*, 382 F.3d at 512). A court's determination of the existence of reasonable suspicion requires an examination of "the totality of the circumstances in the situation at hand, in light of the individual officers' own training and experience." *United States v. Monsivais*, 848 F.3d 353, 357 (5th Cir. 2017) (quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)) (internal quotations omitted).

Restated simply, a traffic stop is not an unconstitutional seizure of the person if the officer has a reasonable suspicion that illegal activity, such as a traffic violation, has occurred. Once the officer has concluded the business related to the initial constitutional stop, he may thereafter continue to hold the accused if he has reasonable suspicion that other criminal activity is afoot. The detention may continue until officer is satisfied that the criminality is or is not occurring. The continued hold is likewise not an unconstitutional seizure of the person.

## A. Constitutionality of the Detention

As discussed, the constitutionality of traffic stop under *Terry* has two prongs, and we are confident that the first prong of *Terry* is satisfied. The defendant has conceded in his briefs[2] that he committed an improper lane usage violation, and thus McKee's initial stop was "justified at its inception." *Andres*, 703 F.3d at 832. Defendant contends, however, that the second prong of *Terry* was not satisfied, as McKee's actions subsequent to the stop were not "reasonably related in scope to the circumstances that justified the stop of the vehicle in the first place." *Id*. Defendant argues that while McKee was permitted to ask for his license and registration and perform a computer check thereon, checking for defendant's criminal history and using the LPR system to verify his stated itinerary went beyond the scope of the initial stop. Doc. 31, att. 2, pp. 13-14. Defendant

---

[2] Doc. 31, att. 2, p. 11; Doc. 70, p. 6, n. 1.

maintains that McKee had no reasonable suspicion that an additional crime was being committed and thus no basis to prolong the detention to investigate suspected drug trafficking activity. *Id.*

The defendant argues that the observations McKee relied on to form reasonable suspicion are all "susceptible to innocent explanation." Doc. 70, p. 9. Defendant argues that his purported "nervousness" is not evident from the body camera footage, that he in fact handled himself coolly, and that the Fifth Circuit has found reasonable suspicion only in cases where defendants were far more visibly nervous.[3] *Id.*, p. 11. Additionally, he argues that some level of nervousness is understandable when one is pulled over by law enforcement. *Id.* He claims the mess in his vehicle was to be expected since he was "traversing several states and staying out-of-town for a week's time." *Id.*, p. 12. Similarly, the presence of luggage in defendant's vehicle is typical for someone engaged in interstate travel. *Id.*, pp. 12-13. Finally, defendant maintains that McKee's perceived inconsistencies between the defendant's stated itinerary and the results of the LPR search are "minor, insignificant, and reconcilable." *Id.*, p. 14. He contends that his statements that he was in Texas generally and in Sugarland were not lies, but only lacked the level of detail McKee would have preferred. Doc. 31, att. 2, p. 21. Defendant argues that the purported inconsistencies are "not probative of any criminal activity." Doc. 70, p. 15.

Defendant contends that collectively, the foregoing circumstances are less incriminating than those where courts within the Fifth Circuit have declined to find reasonable suspicion. *Id.*; Doc. 31, att. 2, pp. 13-14. He stresses that McKee failed to articulate a link between defendant's behavior and "any specific criminal activity." Doc 70, p. 16. Defendant suggests that McKee acted only upon a mere hunch, which is insufficient for reasonable suspicion. *Id.* Defendant argues that

---

[3] i.e. – "heavy breathing, shaking hands and a visibly pulsing carotid artery." Doc. 70, p. 11 (citing *Pack*, 612 F.3d at 345.)

the K-9 sniff and resulting vehicle search arose from this unconstitutional detention and therefore the results of the vehicle search should be suppressed. *Id.*, p. 18.

The government contends McKee started to form reasonable suspicion of drug trafficking activity upon first encountering defendant and asking questions that are within the permissible scope of traffic stops—such as questions about the driver's travel itinerary.[4] Doc. 71, pp. 8-12. Thus, the government argues that McKee had formed his reasonable suspicion *before* checking the LPR system and defendant's criminal background. *Id.* Alternatively, if he had not formed reasonable suspicion prior to the computer check, the government contends that he certainly did upon reviewing the LPR data. *Id.*, p. 12. The government argues that courts in the Western District of Louisiana have held that an LPR system check falls within the scope of a traffic stop, and that this was simply a continuation of McKee's effort to confirm defendant's purported travel plans. Doc. 71, p. 14. Finally, the government argues that even if the LPR check did fall outside the reasonable scope of the traffic stop, such an effort did not constitute an unconstitutional delay because it took less than two minutes and he conducted it in conjunction with the other routine steps of the stop. *Id.*, pp. 15-16.

Viewing the circumstances in the light of McKee's years of experience,[5] we agree with the government and find that reasonable suspicion arose for McKee to extend the detention beyond the original purpose of the traffic stop. Just prior to and during the traffic stop, McKee observed the following:

---

[4] "[An officer] may also ask about the purpose and itinerary of the occupants' trip … we consider these questions to be reasonably related in scope to his investigation of the circumstances that caused the stop." *Pack*, 612 F.3d at 350.
[5] McKee testified that he has been with Louisiana State Police for 12 years and 2 months. Doc. 67, p. 5. Specifically, he has conducted interdiction patrols for over two years and has made 50-75 arrests, with the majority being for narcotics. *Id.*, pp. 23-24.

1. Defendant's vehicle, which was travelling on a major drug-trafficking corridor,[6] braked sharply when passing McKee's unit despite travelling at a reasonable rate of speed.

2. Four to five duffle bags were in defendant's vehicle despite being on only a two-day trip and travelling alone.

3. Defendant's rental vehicle was messy only a few days into his trip, containing an accumulation of food waste and wrappers which was indicative of driving a long distance without stopping.

4. The defendant was purportedly nervous—stuttering, handing McKee the wrong documents, and giving vague, broken-up answers to McKee's questions about his travel itinerary in contrast to quick and confident answers about his past military service.

The foregoing observations occurred prior to McKee returning to his vehicle to carry out the routine steps of a traffic stop, such as checking the driver's license. We find that these observations occurred within the reasonable scope of the original purpose of the stop and amounted to McKee's suspicion of additional criminal activity. McKee's subsequent actions, including the LPR check and the criminal background check, were efforts to either confirm or dispel that suspicion.

Upon completion of the computer searches, McKee's suspicion heightened: the location of defendant's vehicle was found to be as far as 140 miles south of the location that he claimed he travelled to. Doc. 67, p. 18; Doc. 71, p. 5. McKee construed the results as showing that defendant was travelling towards the Mexican border. Doc. 67, p. 18. Additionally, McKee discovered that defendant had prior felony convictions. *Id*., p. 19. The government admits that prior convictions are not necessarily indicative of criminal activity. Doc. 45, p. 12, n. 4. The felony convictions, however, meant that defendant could not carry a firearm even though he claimed to own a security business, further casting his stated purpose for travel into doubt. *Id*.; Doc. 71, pp. 5-6. We find that the LPR and criminal background check did not create the initial reasonable suspicion but only

---

[6] McKee testified that Interstate 10 is "a main corridor for drug smuggling out of Mexico and the western part of the U.S." Doc. 67, p. 6.

confirmed McKee's already-existing reasonable suspicion of drug trafficking. As such, McKee did not improperly order the K-9 sniff search because reasonable suspicion of additional criminal activity besides the traffic violation emerged and he was permitted to investigate in order to confirm or dispel that suspicion. *Peña-Gonzalez*, 618 F. App'x 195, 198 (noting that there is an exception to the Fourth Amendment derived from *Terry* which "permits elongation of a traffic stop if reasonable suspicion of additional criminal activity emerges.").

The defendant argues that McKee should have confronted him about the inconsistencies between defendant's purported travel itinerary and the results of the LPR search. Doc. 70, pp. 14-15 (citing *United States v. Bell-Brayboy*, No. 17-63, 2017 WL 5078400, at *6 (W.D. La. Oct. 3, 2017)). As the government points out, however, McKee did give the defendant the opportunity to explain. McKee can be heard on the body camera footage[7] asking defendant whether he had travelled only to Sugarland, and whether anyone else had been in possession of the vehicle for the last few days. Doc. 71, pp. 12-13. Thus, McKee properly formed reasonable suspicion before ordering the K-9 sniff search, the positive alert from which provided the probable cause for the search of defendant's vehicle.

While defendant cites a host of cases attempting to demonstrate that courts have required more incriminating circumstances for reasonable suspicion, we find that none of these cases are dispositive.[8] Doc. 70, p 15. As the *Bell-Brayboy* court noted, "[e]xamples from other cases are

---

[7] Doc. 66, att. 2 at T05:42:39Z – T05:42:58Z.

[8] In *United States v. Jenson*, the Fifth Circuit upheld a finding of no articulable suspicion. In that case, the officer found that the vehicle took an unusually long time to pull over, the driver behaved nervously and spoke excessively, and the officer noted an inconsistency in the driver's answers to his questions about his employment. 462 F.3d 399, 402-03 (5th Cir. 2006). In *United States v. Dortch*, the officer relied on the fact that the defendant claimed to be renting the vehicle but was not listed on the rental agreement, there was confusion as to defendant's relationship to the proper renter of the vehicle, and the driver and his passenger gave conflicting answers to questions about their stay in Houston and were purportedly nervous. The *Dortch* court found that this was insufficient for reasonable suspicion of drug trafficking. 199 F.3d 193, 198-99 (5th Cir. 1999). In *United States v. Jones*, the court found no reasonable suspicion of drug trafficking where defendants' answers regarding their employment were allegedly inconsistent and one of the defendants acknowledged a prior drug charge. 234 F.3d 234, 241-42 (5th Cir. 2000). In *United States v. Santiago*,

merely illustrative, as reasonable suspicion is fact-intensive and turns on the circumstances of a particular case." 2017 WL 5078400, at *7. Defendant has tried to explain away each individual factor that McKee relied on. However, the inquiry looks to the totality of the circumstances; individual factors, while they may have an innocent explanation, should be not be considered in isolation but in the aggregate. *United States v. Ibarra-Sanchez*, 199 F.3d 753, 759 (5th Cir. 1999). Moreover, while a fact may be susceptible to an innocent explanation, there do exist "circumstances in which wholly lawful conduct might justify the suspicion that criminal activity was afoot." *United States v. Sokolow*, 490 U.S. 1, 9 (1989) (quoting *Reid v. Georgia*, 448 U.S. 438, 441 (1980)). In sum, defendant's cited cases do not alter our analysis.

### B. Pretext as a Factor in Forming Reasonable Suspicion

Defendant argues that the traffic stop was pretextual and that McKee's intent at its inception was to "morph a routine traffic stop into a full-fledged drug investigation." Doc. 70, p. 17. McKee testified that on the night that he pulled defendant over, he was conducting criminal interdiction patrol which by its nature "look[s] past the initial stop" for indicators of other criminal activity. *Id*. As such, defendant urges this court to consider pretext as a factor. *Id*. Defendant argues McKee's goal of ultimately conducting a drug investigation, and not the actual circumstances before him, formed McKee's reasonable suspicion. *Id*.

---

where the driver and his passenger appeared nervous and gave conflicting answers about their destination, the Fifth Circuit found there was no reasonable suspicion that the vehicle contained narcotics or weapons. 310 F.3d 336, 341-42 (5th Cir. 2002). In *United States v. Thibodeaux*, the Fifth Circuit found defendant's behavior, including hesitating to pull over and go to the officer when asked to do so, attempting to return to his car, appearing "jittery," and ultimately becoming emotional and collapsing on the ground was insufficient for the officer to form reasonable suspicion. 276 F. App'x 372, 377-81 (5th Cir. 2008) (unpubl.) In the present case, there were far more factors at play than just nervousness, prior felony convictions, and inconsistencies in the defendant's story. Here, McKee observed 4-5 duffel bags in the vehicle for a trip only lasting a few days, the defendant travelling on a major drug trafficking corridor, stress-induced driving, and an excessive mess inside the vehicle. Thus, McKee acted on more than just a mere hunch. Unlike the officers in the foregoing cases, McKee was able to take the factors he observed and articulate how each one was not just generally suspicious, but consistent with drug trafficking.

We agree with the government that we need not consider McKee's subjective intent in performing the traffic stop because the relevant inquiry is not a subjective one. Doc. 71, p. 17. So long as there was objective reasonable suspicion to stop defendant's vehicle, the officer's actions were justified. *See Goodwin*, 132 F.3d at 173 (noting that the officer's purpose for making the stop is "irrelevant for the purposes of the Fourth Amendment" so long as there was objective justification.) Here, the justification was an improper lane usage violation which the defendant has already conceded to. Doc. 31, att. 2, p. 11; Doc. 70, p. 6, n. 1.

### C.  Sufficiency of the K-9 Alert to Create Probable Cause

In his post-hearing brief, defendant suggests that law enforcement could not rely on the K-9 alert on defendant's vehicle as probable cause to search defendant's vehicle. Doc. 70, pp. 19-20. Defendant cites Agent Nguyen's testimony that his dog, Dela, holds a "10/12 record in an entire three (3) year period" thus yielding a "16.7% failure rate." *Id*. Additionally, defendant argues that Dela alerted to the "exact opposite end of the vehicle from where the contraband was later discovered." *Id*., p. 19. As such, defendant argues that Dela is unreliable and this "undermines the various bases by which Trooper McKee attempted to rely upon to justify his warrantless search of Defendant." *Id*., p. 20.

The standard for a challenge of the reliability of a K-9 or a particular K-9 alert is "whether all the facts surrounding a dog's alert, viewed through the lens of common sense, would make a reasonably prudent person think that the search would reveal contraband or evidence of a crime." *Florida v. Harris*, 568 U.S. 237, 248 (2013). We also keep in mind that the requisite threshold here is probable cause, which requires only a "fair probability," not a 100% certainty, that contraband would be found. *Id*. at 244. Thus, we find that a positive alert from a dog with a 16.7% failure rate (or 83.3% success rate) sufficiently establishes probable cause that there was

contraband inside the vehicle. Moreover, Nguyen explained that Dela alerted on the driver's side of the vehicle because there was an open window there from which she picked up the scent. Doc. 67, p. 75. We find that the location of Dela's alert did not render her unreliable and officers properly relied on her alert as probable cause for the search of defendant's vehicle.

## III.
### CONCLUSION

For the foregoing reasons, it is **RECOMMENDED** that the defendant's Motion to Suppress [doc. 31] be **DENIED**.

Pursuant to 28 U.S.C. § 636(b)(1)(C) and Rule 59(b) of the Federal Rules of Criminal Procedure, the parties have fourteen (14) days from receipt of this Report and Recommendation to file written objections with the Clerk of Court. Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days of receipt shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error. *See Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1429–30 (5th Cir. 1996), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1)), *as recognized in Cruz v. Rodriguez*, 828 F. App'x 224, (5th Cir. 2020) (unpubl.)

THUS DONE AND SIGNED in Chambers this 20th day of April, 2021.

_____
KATHLEEN KAY
UNITED STATES MAGISTRATE JUDGE